**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**AMY BECKWORTH, et al.,**

    **Plaintiffs,**

v.                                                                   **Case No. 3:12cv351/MCR/EMT**

**SENIOR HOME CARE, INC., et al.,**

    **Defendants.**

                                                 /

## **ORDER**

Plaintiff Amy Beckworth filed this putative collective action against Defendants on behalf of herself and similarly situated employees seeking unpaid overtime wages and liquidated damages pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* The Court entered an Order advising the parties that the case would proceed according to a two-stage analysis for FLSA collective actions suggested by the Eleventh Circuit. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008), *cert. denied*, 130 S. Ct. 59 (2009); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001), *cert. denied*, 534 U.S. 1127 (2002). The Court conditionally certified a class of home-healthcare registered nurses ("RNs") who worked for Defendants from July 19, 2009 to November 5, 2012.[1] Plaintiff Beckworth sent Court-approved notices to approximately 2,186 putative members of the class, and 130 of them members filed opt-in consent forms. Since that time, the Court has permitted 46 plaintiffs to withdraw from the class, and 22 plaintiffs have been dismissed without prejudice to refiling after reimbursing

---

[1] The Court adopted the parties' proposed class description of "all HOME HEALTH REGISTERED NURSE[S]/Registered Nurses (hereinafter "RNs") who were or are employed with the Defendants, SENIOR HOME CARE, INC., ROBERT FUSCO and LYNNE HEBERT, including the employees of the Defendants that work for their affiliated companies in Louisiana that operate under the name, SYNERGY HOME CARE. The Notice will be sent to all RN's who worked for the Defendants, SENIOR HOME CARE, INC., ROBERT FUSCO and LYNNE HEBERT, and their affiliated companies that operate under the name SYNERGY HOME CARE, from July 19, 2009 until the present."

Case No. 3:12cv351/MCR/EMT

Defendants for litigation expenses associated with their respective discovery violations.[2]  Accordingly, the current conditionally certified class consists of Plaintiff Beckworth and 62 opt-in members for a total of 63 plaintiffs.  Now pending before the Court is Defendants' Motion for Decertification (doc. 250).  Having fully considered the matter, the Court finds decertification appropriate.

**Background**

Defendant Senior Home Care, Inc. ("SHC") is a company based out of Clearwater, Florida that provides home healthcare services to homebound patients in Florida and Louisiana.[3]  During the period of time relevant to the claims in this case, SHC operated 47 branch divisions with 30 offices in Florida and 17 offices in Louisiana.[4]  According to SHC's Director of Branch Support Services Yvonne Hymel, the different branches operated using the same basic policies and procedures.  Each branch employed an office staff to perform administrative duties.  Office staff members included directors of operations (also referred to as branch managers), billing assistants, records custodians, intake specialists, clinical resource managers, clinical field staff specialists, and patient service coordinators.  Many directors, clinical resource managers, and clinical field staff specialists were RNs who primarily worked in the branch offices.

In addition to the office staff, the operations directors oversaw "field employees," who provided treatment to patients in their homes and assisted living facilities.  The field employees included home healthcare aides, therapists, social workers, and RNs.  SHC also established different job positions for the RNs who primarily worked in the field and referred to each one as either a "[Field] RN," a "Psychiatric RN," a "Hi-Tech RN," a "Wound

---

[2] These plaintiffs did not respond to Defendants' discovery requests over a period in excess of five months and failed to comply with the Court's two discovery Orders; they further failed to communicate with their counsel or the Court and prejudiced Defendants' defense.  Therefore, the Court adopted the Chief Magistrate Judge's Report and Recommendation (doc. 265) and dismissed these plaintiffs without prejudice to refiling on the stated conditions as a sanction pursuant to Federal Rule of Civil Procedure 37.

[3] SHC's Chief Executive Officer Robert Fusco and Chief Operating Officer Lynne Hebert are also named defendants in this action.

[4] Louisiana offices operated under the name "Synergy Home Care," which SHC acquired in 2007.

Case No. 3:12cv351/MCR/EMT

Care Clinical Liaison," or a "Behavioral Health Clinical Liaison."[5] The Field RNs generally assessed and treated patients for various medical diagnoses and conditions; however, only Psychiatric RNs had the necessary certifications from the Centers for Medicare and Medicaid Services to treat psychiatric disorders like depression. Similarly, only the Hi-Tech RNs were qualified to perform certain treatment functions during patient visits, such as administering intravenous chemotherapy.[6] The RNs' job responsibilities varied from patient-to-patient depending on the nature of the visit (i.e, whether the patient was being admitted, recertified, or discharged), as well as the particular patient's diagnosis and condition – all of which impacted the amount of time an RN spent working during each visit.

SHC employees also worked in one of four different job classifications: (1) full-time; (2) full-time with an 80-percent productivity requirement; (3) part-time; or (4) "as-needed."[7] Employees who held office positions as directors of operations, clinical resource managers, and clinical field staff specialists were classified as full-time; whereas the field employees, including RNs, had various classifications.[8] SHC anticipated that those employees in full-time positions would work between 32 and 40 hours per week, and others would work less than 32 hours per week. These classifications also affected an employee's job duties; for example, a full-time Field RN typically had responsibility for the management of a patient's care, including coordinating treatment by the aides and therapists, but as-needed Field RNs did not have the same responsibilities because they were not consistently assigned to the same patients. Additionally, SHC used four different compensation methods: (1) some employees were paid "per visit" made to a patient's home, and (2) if those

---

[5] Some RNs held different job titles during the claims period. Of the current class, as well as the class members who have been dismissed without prejudice to refiling, 50 worked as Field RNs; 17 worked as Psychiatric RNs; one worked as a Hi-Tech RN; two worked as Wound Care Clinical Liaisons; and none worked as a Behavioral Health Clinical Liaison during the claims period.

[6] To be clear, all of the Field RNs, Psychiatric RNs, and Hi-Tech RNs worked as "field employees."

[7] Full-time employees were entitled to company benefits. Some RNs held different classifications during the claims period.

[8] Of the current class, as well as the class members who have been dismissed without prejudice to refiling, 58 worked full-time; four worked full-time with an 80-percent productivity requirement; four worked part-time; and 35 worked on an as-needed basis.

Case No. 3:12cv351/MCR/EMT

employees attended in-office conferences to discuss a patient's plan of care, they were paid an hourly wage for that time – a compensation method referred to as "per visit plus 'non-visit' pay;"[9] (3) some employees were paid salary, and (4) if those salaried employees visited patients, they were paid "per visit" – a compensation method referred to as "salary plus per-visit."[10]  Regardless of the respective compensation method, SHC treated all RNs as exempt from earning overtime compensation under the FLSA as either professionals, administrators, or executives.  *See* 29 U.S.C. § 213.

Regarding all per-visit payments, an employee was paid a set flat fee for each patient visit regardless of how much time the employee spent working during each visit. The per-visit payments were also designed to compensate employees for work related to the visits, such as traveling, documenting medical notes, and communicating with patients' family members.  The per-visit fee rate varied depending on the type of visit as well as each employee's rate agreement with SHC.  Each branch's director of operations established the rates at SHC.  These rates differed among the branches and even among RNs working out of the same branch.  Factors that impacted the rates included the type of visit and its complexity, the RN's qualifications and experience, the size of the branch's territory, and competitors' rates in the region.[11]  Field employees who worked "full-time"

---

[9] However, one Field RN who worked in Louisiana testified that she was paid a flat rate regardless of the amount of time the conference required.

[10] SHC paid some RNs using different payment methods during the claims period.  Most RNs who were paid per visit were also paid "per visit plus 'non-visit' pay."

[11] For example, Plaintiff Beckworth worked as a Field RN in Pensacola, Florida and was paid a rate of $65.00 per patient-admission visit, $33.00 per routine visit, $45.00 per resumption-of-care visit, $60.00 per recertification visit, and $35.00 per discharge visit; however, Plaintiff Tawanda Nelson was a Field RN in Pensacola and was paid only $50.00 for a recertification visit.  Plaintiff Enid Atkinson worked as a Psychiatric RN in Orlando, Florida and was paid a rate of $75.00 per patient admission, $45.00 per routine visit, $70.00 per resumption-of-care visit, $70.00 per recertification visit, and $60.00 per discharge visit.  Plaintiff Atkinson also received $55.00 per psychiatric visit; however, Plaintiff Kassandra Williams, who was a Psychiatric RN in Baton Rouge, Louisiana, was paid a rate of only $40.00 per psychiatric visit.  Plaintiff Rita Almond, who worked as a Hi-Tech RN in Port St. Lucie, Florida, was paid $68.00 per patient-admission visit, $39.25 per routine visit, $63.85 per resumption-of-care visit, $62.85 per recertification visit, and $52.55 per discharge visit. Plaintiff Almond also received $53.00 an "IV Hi-Tech" visit.

were expected to perform between 24 and 30 patient visits (or visit equivalents)[12] per week, depending on the particular branch, but the actual hours they worked varied from week to week. Plaintiffs classified as "full-time with an 80-percent productivity requirement" were not expected to perform more than 25 visits per week, and the part-time and as-needed RNs had no expected number of visits.

SHC required RNs to record their daily work activities during the visits and make notes of patients' medical conditions.[13] From at least July 2009 through June 2011, SHC employees in Florida used a system called "Health Wyse" to record their work. With this system, RNs used either electronic devices or paper forms to track their activities,[14] and a database would generate daily activity reports detailing the time RNs spent visiting patients along with accompanying travel time. The Health Wyse system also allowed the RNs to document medical notes, but the system did not permit the RNs to separately record time spent charting or performing patient visit-related activities, such as corresponding with a patient's physician or dropping off blood work at a laboratory.[15] In June 2011, SHC facilities in Florida began converting to a new recording system called the Home Care Home Base ("HCHB"). All offices in Florida converted to the HCHB system by November 2011. With the HCHB system, employees used an electronic and mobile operating system to record all medical notes and simultaneously record time spent at visits, during travel, and throughout the charting process. Employees also could log work performed outside of the time spent during the actual visits. SHC employees in Louisiana, on the other hand, never used the Health Wyse system, and until October 2011, they

---

[12] Patient "visits" were synonymous with "points" at SHC, and some patient visits, such as admission visits, were worth more than one point (and thus counted as more than one "visit" for purposes of meeting the requirements for "full-time" compensation).

[13] Employees who attended in-office conferences were paid hourly based on attendance forms submitted.

[14] If paper forms were used, office workers would later input the information into the Health Wyse system.

[15] Sometimes the charting could not be completed in the patients' homes during visits; thus, RNs may have spent additional time after a visit completing the necessary patient-chart work.

Case No. 3:12cv351/MCR/EMT

tracked their patient visits and related work on handwritten forms using a system called "Patron." Charting time was not separately tracked under the Patron system. Louisiana offices began converting to the HCHB system in October 2011, and the conversion was completed in January 2012. Testimony shows that the field RNs working in various regions had different practices for time recording.[16]

Plaintiff Beckworth filed the instant suit on July 18, 2012, alleging that Defendants willfully failed to pay her and similarly situated RNs overtime compensation for the hours they worked in excess of forty hours per week. Defendants filed an Answer, asserting in part that Plaintiff Beckworth and the other RNs were barred in whole or in part from recovering overtime compensation pursuant to the applicable statute of limitations, the Portal-to-Portal Act, 29 U.S.C. § 251, *et seq.*, and the FLSA exemptions in Section 213. As explained *supra*, the Court adopted the parties' proposed class description of "all [RNs] who were . . . employed with the Defendants" from July 19, 2009 to November 5, 2012, and 63 plaintiffs currently comprise the class. Defendants have moved for decertification, and in response, Plaintiffs have abandoned their original position that "all [RNs]" should make up the class and instead now argue that the class should consist only of the RNs who were paid the "per visit" rate for home healthcare visits and also an hourly rate for the in-office meetings. (*See* doc. 259 at 17 ("The main issue in this case is whether the Defendants violated the FLSA by classifying and/or treating the Plaintiffs, specifically the 'per visit plus non-visit pay' . . . Clinicians, as exempt employees but paying for non-visit work based on the amount of hours."); doc. 259 at 20 ("However, this cause of action is only to include those employees that are/were paid on a 'per visit' basis which seemingly precludes all but a few job titles, including, but not limited to, Field RN, Hi-Tech RN, and Psych RN."); *see also* doc. 259, at 7, 10, 27-28.) Accordingly, the Court will proceed with the decertification

---

[16] For example, Plaintiff Julia Wright did not track her mileage and at times forgot to utilize her HCHB android device. Plaintiff Theresa Delapenha-Lewen stated that her device did not accurately record the time she spent working because it did not count the time she spent on the phone when her branch office called during a patient visit. Although some RNs completed their charting work during patient visits, Plaintiffs Beckworth and Sally Magee-Henk testified that they spent time charting medical notes *after* finishing patient visits and did not record the time.

analysis within the confines of Plaintiffs' more limited position.

**Discussion**

An FLSA action "may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The law requires that similarly situated employees consent to be included in the suit. *Id.* ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). Thus, "the existence of a collective action under § 216(b) depends on the active participation of other plaintiffs." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008) (quoting *Cameron–Grant v. Maxim Healthcare Servs. Inc.*, 347 F.3d 1240, 1249 (11th Cir. 2003)), *cert. denied*, 558 U.S. 816 (2009). The Eleventh Circuit has suggested a two-stage analysis for collective actions. *Id.* at 1260; *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001), *cert. denied*, 534 U.S. 1127 (2002). At the first stage, which is referred to as the "notice stage," the district court determines, usually based only on the pleadings and submitted affidavits, whether to conditionally certify a class and issue notices to potential members. *Hipp*, 252 F.3d at 1218. In reaching this decision, the court considers whether there are other employees who desire to opt-in and whether those employees are "similarly situated with respect to their job requirements and with regard to their pay provisions." *Morgan*, 551 F.3d at 1259. The second stage is usually triggered by a defendant's motion for decertification, at which point the plaintiffs bear the burden to establish that, in terms of their employment, they are similarly situated "beyond the mere facts of job duties and pay provisions." *Anderson v. Cagle's Inc.*, 488 F.3d 945, 953 (11th Cir. 2007), *cert. denied*, 553 U.S. 1093 (2008). Plaintiffs do not have to show that they hold identical job positions, *id.*, but "as more legally significant differences appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." *Morgan*, 551 F.3d at 1261. In determining whether to decertify a class, the court considers multiple factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each

plaintiff; and (3) fairness and procedural considerations." *Anderson*, 488 F.3d at 953 (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). Here, the Court has already conditionally certified a class of the home-healthcare RNs who worked for Defendants from July 19, 2009 to November 5, 2012, and currently there are 62 opt-in plaintiffs in the action.[17] Defendants have moved for decertification, and therefore Plaintiffs must show that they are "similarly situated" in order to maintain the certification.

In examining plaintiffs' employment settings, courts in this Circuit consider the following factors:

> (1) whether the plaintiffs all held the same job title; (2) whether they worked in the same geographic location; (3) whether the alleged violations occurred during the same time period; (4) whether the plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision-maker; and (5) the extent to which the actions which constitute the violations claimed by plaintiffs are similar.

*Whineglass v. Smith*, No. 8:11cv2784, 2013 WL 2237841, at *7 (M.D. Fla. May 21, 2013) (quoting *Bedoya v. Aventura Limousine & Transp. Serv., Inc.*, No. 11-24432-CIV, 2012 WL 1933553, at *4 (S.D. Fla. Apr. 10, 2012)), *report and recommendation adopted*. Having carefully considered the record, the Court finds that the class members' employment settings are too disparate to support a class in this case. The RNs in Plaintiffs' more-narrowed group held at least three different job titles, including that of Field RN, Psychiatric RN, and Hi-Tech RN.[18] Significantly, these different titles correlated to different job duties and pay rates. For example, Psychiatric and Hi-Tech Rns, but not field RNs, were qualified to perform certain medical procedures and were compensated at a higher rate for those procedures. Even for those procedures that all RNs were permitted to perform, such as patient admissions, the specialists' qualifications resulted in higher pay rates for fulfilling

---

[17] Amy Beckworth is the named plaintiff in the action, bringing the class total to 63 plaintiffs. Twenty-two plaintiffs who formerly filed consent forms have been dismissed without prejudice to refiling upon respectively reimbursing Defendants for litigation expenses associated with discovery violations.

[18] Were the Court to consider the plaintiffs who have been dismissed without prejudice to refiling, there would be a fifth title of Wound Care Clinical Liaison.

the same duties. The RNs worked in 29 different branches throughout different cities in Florida and Louisiana, which further subjected the RNs to different pay rates and record-keeping procedures. Some RNs allege violations that occurred during different times within the claims period, and, even though some overlap is present,[19] the difference in time periods is material in this case because of the various record-keeping systems used among the branches at different times. *Cf. Hughes v. Burie*, No. 3:12cv332, 2014 WL 1572543, at *3 (N.D. Fla. Apr. 18, 2014) (explaining that having different employment periods "is not an absolute bar to a finding that [employees] were all similarly situated"), *report and recommendation adopted*. Although the branches may have used the same basic operating procedures and similarly exempted the RNs from earning overtime compensation, there are critical differences in the applicable payment methods for the RNs: Field RNs who worked full-time had responsibility for the overall management of patient care, including coordinating treatment among the aides and therapists; whereas, Field RNs who worked on an as-needed basis were called in to see patients managed by other RNs, which meant the as-needed Field RNs spent additional time during the visits reviewing unfamiliar patients' medical histories. The as-needed Field RNs also attended fewer in-office conferences. On these facts, the Court finds that the RNs who worked as field employees and were paid per-visit plus hourly compensation for office visits had disparate employment settings. *See Morgan*, 551 F.3d at 1264 n.46 ("Just because a business classifies all employees in a particular job category as exempt does not mean that those employees are necessarily 'similarly situated' . . . ; [r]ather, it is necessary to review the actual job duties . . . .").

The Court next considers "defenses available to defendants that appear to be individual to each plaintiff." *Anderson*, 488 F.3d at 953. Defendants likely will pursue a similar exemption defense against all of the class members and argue the members were professionals paid on a fee basis and therefore not entitled to compensation for overtime

---

[19] For example, Plaintiff Jayme Brunet worked for Defendants until August 24, 2010; Plaintiff Kathylee Johnson did not start working for Defendants until May 7, 2012; but Plaintiff Rita Almond worked for Defendants from May 17, 2006 through at least June 10, 2013.

hours.  *See* 29 U.S.C. § 213(a)(1) (providing that overtime compensation requirements "shall not apply with respect to any employee employed in a bona fide . . . professional capacity . . . "); 29 C.F.R. §§ 541.300, 541.605.  It seems equally likely, however, that Defendants will assert additional defenses that would apply to some, but not all, of the class members.  For example, Plaintiff Julia Wright worked as an "as-needed" Field RN who was paid per visit and earned $128,879 in 2010, which means she could be exempt from overtime compensation as a "highly compensated employee."  *See* 29 C.F.R. § 541.601 (providing that "[a]n employee with total annual compensation of at least $100,000" may be exempt).  Many other class members, particularly those who did not work for SHC for an extended period of time, did not earn this amount of pay.  Further, the statute of limitations, even when extended to three years on a showing of willfulness, *see* 29 U.S.C. § 255, appears to bar certain class members' claims and not others.  For example, Plaintiff Carole Gowing worked as a Field RN and was last employed on November 6, 2009, but she filed her consent form over three years later on November 20, 2012.  *See* 29 U.S.C. § 256 (providing that an action is not commenced for purposes of the statute of limitations in a collective action until the individual claimant files a written consent form with the court).  Other class members have timely commenced their causes of action against Defendants.  Also, at least one class member, Jayme Brunet, could be subject to a defense of estoppel because she did not disclose her overtime compensation claim in connection with her bankruptcy petition filed in April 2013 in the United States Bankruptcy Court for the Western District of Louisiana.[20]  *See Muse v. Accord Human Resources, Inc.*, 129 F. App'x 487, 488-90 (11th Cir. 2005) ("Judicial estoppel precludes a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."); *Anderson v. Entergy Operations, Inc.*, No. 5:11cv103, 2012 WL 5400059, at *2-5 (S.D. Miss. Nov. 5, 2012) (finding that an FLSA plaintiff should be estopped from pursuing the claim because he represented to the bankruptcy court that he

---

[20] The Court takes judicial notice of the date and court of filing.  *See* Fed. R. Evid. 201.  The record in the instant case further shows that Plaintiff Brunet worked for SHC between October 2007 and August 2010, and she filed her consent form with this Court on January 30, 2013.

Case No. 3:12cv351/MCR/EMT

had no contingent or unliquidated claims). Finally, Defendants identify additional defenses that may be individual to only some class members, but the preceding examples are more than sufficient for the Court to find that there are, in fact, "defenses available to defendants that appear to be individual to each plaintiff," in addition to the individualized inquiries necessary to establish liability. *Anderson*, 488 F.3d at 953; *see Rindfleisch*, 2014 WL 2002834, at *5 (decertifying a class of home-healthcare clinicians who were paid flat rates for in-home visits and classified as exempt from overtime compensation by their employer partly because "individual determinations regarding liability must be made").

Regarding "fairness and procedural considerations," *id.*, the Eleventh Circuit has explained that FLSA collective actions serve the purposes of "(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Morgan*, 551 F.3d at 1264. Although a collective action would permit the conditionally certified class members to pool their resources, the Court finds that proceeding in such a manner will not be efficient. Procedural concerns arise because of the varying pay rates among the branches and RNs who worked in the field, as well as the different job classifications such as the as-needed RNs who were less likely to even earn the additional hourly pay. Although the fact-intensive nature of the claims does not necessarily prevent a collective action, *id.* at 1263, the *individualized* inquiries required here show that this case is not susceptible to a common means for determining liability or measuring damages.[21] *See Wallace v. Norcross Assocs., LLC*, No. 1:13cv1349, 2014 WL 1373659, at *4 (N.D. Ga. Apr. 8, 2014). Further, "the availability of defenses to some but not all of the putative class members clearly poses significant case management concerns." *Anderson*, 488 F.3d at 954 n.8. Plaintiffs argue that the parties may use representative testimony to cure the procedural concerns, but

---

[21] The Court is also concerned that at least one class member, Plaintiff Kassandra Williams, who was hired as a full-time Psychiatric RN, may not even be able to establish liability for overtime compensation because she worked at SHC for less than one week for a total of 16 hours and made no patient visits during that time. *See Rindfleisch v. Gentiva Health Servs., Inc.*, No. 1:10cv3288, 2014 WL 2002834, at *5 (N.D. Ga. Apr. 18, 2014) ("[T]he Court cannot envision a more pertinent disparate factual setting, for purposes of the similarly situated inquiry, among a group of Plaintiffs than the fact that some members of the group do not actually have a viable claim in the action at issue.").

Case No. 3:12cv351/MCR/EMT

SHC's evolving record-keeping systems, the RNs' varying time spent at each of the patient visits, differing pay rates, and their individual charting practices suggest that representative testimony would be ineffective and would likely result in multiple mini trials for purposes of establishing both liability and damages.[22]  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773-74 (7th Cir. 2013) ("To extrapolate from the experience of the 42 to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage."); *Rindfleisch*, 2014 WL 2002834, at *6 ("[R]epresentative testimony regarding hours worked to determine an amount of damages is inappropriate when the issue of liability. . . is still in question in regards to certain Plaintiffs."); *King v. CVS/Caremark Corp.*, No. 07-21824-CIV, 2008 WL 5973490, at *6 (S.D. Fla. Sept. 11, 2008) ("[T]he Court[] is not persuaded that representative testimony would be appropriate based on the variation in stores, management practices and factual disparities as to each Plaintiff.")

In sum, Plaintiffs have failed to carry their burden to establish that class members are "'similarly situated . . . beyond the mere facts of job duties and pay provisions," *Anderson*, 488 F.3d at 953, and the Court thus finds that the class should be decertified. *See generally Rindfleisch*, 2014 WL 2002834.

Accordingly:

1. Defendants' Motion for Decertification (doc. 250) is **GRANTED**.

2. The claims of all opt-in Plaintiffs are **DISMISSED without prejudice**. The statute of limitations period is tolled for these Plaintiffs for a period of **sixty (60) days** beginning on the filing date of this Order. Plaintiff Amy Beckworth's individual claims will proceed.

3. No Plaintiff previously dismissed without prejudice to refiling upon their respective reimbursements to Defendants for litigation expenses associated with discovery

---

[22] Plaintiffs alternatively propose bifurcating the liability and damages phases of trial, but there still would be individual assessments necessary at both stages, *see supra* note 19. Plaintiffs further suggest that the Court could create subclasses; however, Plaintiffs fail to propose any workable subdivisions, and the Court cannot envision any subdivision that would alleviate the problems associated with the need for individualized assessments of rates and hours.

violations (*see* doc. 282) is permitted to refile in the instant action.

      4.      Counsel of record for Plaintiff Amy Beckworth and Defendants shall confer within **thirty (30) days** of the filing date of this Order, as required by Federal Rule of Civil Procedure 26(f), and file a joint report of the parties' discovery and scheduling needs within **fourteen (14) days** thereafter.

      **DONE and ORDERED** this 5th day of September, 2014.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**